No. 24-3899

---

In the

# United States Court of Appeals
# for the Sixth Circuit

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

AMANDA HOVANEC,

Defendant-Appellant.

_____

On Appeal from the United States District Court
for the Northern District of Ohio
No. 3:22-cr-00274-JRK
The Hon. James R. Knepp II, U.S. District Judge

---

## PRINCIPAL BRIEF OF DEFENDANT-APPELLANT

---

Benjamin S. Morrell
Taft Stettinius & Hollister LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Tel.: (312) 527-4000
Fax: (312) 527-4011
bmorrell@taftlaw.com

*Appointed Counsel for Defendant-Appellant*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1,

Defendant-Appellant Amanda Hovanec makes these disclosures:

1. Are any parties a subsidiary or affiliate of a publicly owned corporation?

   No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

   No.

Date: May 14, 2025.

By     _/s/ Benjamin S. Morrell_____

# TABLE OF CONTENTS

Disclosure Statement ................................................................ii

Table of Contents ...................................................................iii

Table of Authorities ................................................................v

Statement Regarding Oral Argument .............................................viii

Statement Regarding Jurisdiction ..................................................1

Questions Presented ..................................................................2

Statement of the Case .................................................................3

I.     Factual background ..............................................................3

     A.    Offense conduct ........................................................3

     B.    Law enforcement's brief investigation ..............................8

II.    Procedural history ..............................................................9

     A.    Indictment and guilty plea ............................................9

     B.    Sentencing ...............................................................10

           1.    The PSR ..........................................................10

           2.    Psychological evaluation .......................................13

           3.    The sentencing hearing .........................................27

     C.    Proceedings against Ms. Hovanec's codefendants...........................19

           1.    Anthony Theodorou ............................................19

           2.    Anita Green ......................................................20

Standard of Review ..................................................................21

Summary of the Argument.........................................................22

ARGUMENT ..................................................................................24

I.    The district court erred by misreading the psychological evaluation
      report and mischaracterizing its important mitigating evidence .................24

      A.    The mitigating evidence detailed in Dr. Brams' report was
            significant and compelling..............................................................24

      B.    The district court clearly erred by mischaracterizing the nature
            of the mitigating evidence in Dr. Brams' report ..............................27

      C.    The district court imposed a substantively unreasonable
            sentence for these same reasons .......................................................32

II.   The district court erred in applying the aggravating role enhancement ......33

III.  The district court erred in applying the obstruction enhancement ............38

CONCLUSION ...............................................................................40

CERTIFICATE OF COMPLIANCE ....................................................42

CERTIFICATE OF SERVICE ...........................................................43

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ..............44

# Table of Authorities

## Cases

*Ake v. Oklahoma*,
    470 U.S. 68 (1985) ........................................................................ 31

*Boyde v. California*,
    494 U.S. 370 (1990) ...................................................................... 24

*Farris v. Barnhart*,
    147 F. App'x 638 (9th Cir. 2005) .................................................. 31

*Gall v. United States*,
    552 U.S. 38 (2007) ............................................................. 21, 22, 27

*Gay v. Parsons*,
    61 F.4th 1088 (9th Cir. 2023) ...................................................... 31

*Hamblin v. Mitchell*,
    354 F.3d 482 (6th Cir. 2003) ....................................................... 25

*McKinney v. Ryan*,
    813 F.3d 798 (9th Cir. 2015) ................................................... 26, 27

*McMullen v. Dalton*,
    83 F.4th 634 (7th Cir. 2023) ........................................................ 29

*Miller v. Dretke*,
    420 F.3d 356 (5th Cir. 2005) ....................................................... 29

*Porter v. McCollum*,
    558 U.S. 30 (2009) ....................................................................... 25

*Proctor v. Harris*,
    413 F.2d 383 (D.C. Cir. 1969) ..................................................... 31

*Reddy v. Kelly*,
    657 F. App'x 531 (6th Cir. 2016) ....................................................27

*Rompilla v. Beard*,
    545 U.S. 374 (2005) ....................................................................25

*Sorensen v. Barnhart*,
    69 F. App'x 864 (9th Cir. 2003) ..................................................32

*United States v. Gillespie*,
    713 F. App'x 471 (6th Cir. 2017) ................................................27

*United States v. Glass*,
    749 F. App'x 434 (6th Cir. 2018) ................................................32

*United States v. Iossifov*,
    45 F.4th 899 (6th Cir. 2022) .......................................................21

*United States v. Kamper*,
    748 F.3d 728 (6th Cir. 2014) .......................................................33

*United States v. Knight*,
    756 F. App'x 571 (6th Cir. 2018) ...................................... 30, 38, 39

*United States v. Minter*,
    80 F.4th 753 (6th Cir. 2023) ........................................... 33, 34, 40

*United States v. Olive*,
    804 F.3d 747 (6th Cir. 2015) ...................................................... 22

*United States v. Robinson*,
    669 F.3d 767 (6th Cir. 2012) ...................................................... 40

*United States v. Sands*,
    948 F.3d 709 (6th Cir. 2020) .......................................................21

*United States v. Thomas*,
    498 F.3d 336 (6th Cir. 2007).......................................................21

*Wiggins v. Smith*,
   539 U.S. 510 (2003) .................................................................. 25, 26

*Williams v. Taylor*,
   529 U.S. 362 (2000) .................................................................. 25, 26

## Statutes

18 U.S.C.
   § 3 ............................................................................................ 20
   § 3231 ........................................................................................ 1
   § 3553 ................................................................................... 24, 33

21 U.S.C.
   § 841 ..................................................................................... 9, 19
   § 846 ......................................................................................... 9
   § 952 ......................................................................................... 9
   § 960 ......................................................................................... 9
   § 963 ......................................................................................... 9

28 U.S.C.
   § 841 .................................................................................. 10, 10
   § 1291 ....................................................................................... 1

USSG
   § 3B1.1 ...................................................................................... 33
   § 3C1.1 ...................................................................................... 39

## Federal Rules

Fed. R. Crim. P. 32 ............................................................... 39, 40

## Statement Regarding Oral Argument

Defendant-Appellant Amanda Hovanec, who is represented pro bono through the Court's CJA program, requests oral argument. This appeal concerns the proper characterization and consideration at sentencing of important mitigating evidence regarding Ms. Hovanec's social background and mental health. Such evidence is especially significant in cases like this one, where the offense conduct resulted in the death of an individual and the potential sentences are long, serving to magnify any error in failing to fully considering mitigation. Oral argument will help highlight the specific factual errors made by the district court in evaluating the most compelling mitigating evidence in the record.

For these reasons, Ms. Hovanec respectfully submits that the Court's decisional process would be significantly aided by oral argument in this case.

### Statement Regarding Jurisdiction

This is a direct appeal from a final judgment in a criminal case. The United States District Court for the Northern District of Ohio had jurisdiction under 18 U.S.C. § 3231 because the indictment alleged that Ms. Hovanec committed violations of federal statutes in that district. (R. 11, Indictment, PageID 85–88.) This Court has appellate jurisdiction because Ms. Hovanec is appealing a final judgment of a district court. 28 U.S.C. § 1291.

The district court entered final judgment on October 3, 2024. (R. 137, Judgment, PageID 3156.) Ms. Hovanec filed her notice of appeal 11 days later. (R. 147, Notice of Appeal, PageID 3221.)

## Questions Presented

1.    Whether the district court clearly erred in rejecting mitigating evidence submitted in a psychological evaluation report when the court (1) adopted the government's assertion that "nothing" in that report was "substantiated," where two interviewees corroborated Ms. Hovanec's statements regarding her history of significant childhood abuse and neglect and resulting mental health disorders, and (2) inaccurately dismissed the report as coming from a "hired advocate" where the psychologist unequivocally stated that she was "retained for her time and expertise, and not to provide any predetermined opinions."

2.    Whether the district court erred in applying a sentence enhancement for having an aggravated role in criminal activity where Ms. Hovanec's codefendant and romantic partner independently engaged in significant criminal activity while alone in South Africa and the district court failed to fairly evaluate evidence of her limited ability to control others due to her social background and mental health disorders.

3.    Whether the district court erred in applying a sentence enhancement for obstruction of justice where it stated it had already determined the enhancement applied before the sentencing hearing and relied on a case having nothing to do with the enhancement.

### STATEMENT OF THE CASE

## I.     Factual background

### A.     Offense conduct

Ms. Hovanec caused the death of T.H., her husband, by injecting him with a controlled substance called etorphine or "M99." (R. 135, Presentence Report ("PSR"), PageID 3106.) The substance was sourced in South Africa and shipped to the United States by Anthony Theodorou, a South African national who had a romantic relationship with Ms. Hovanec. (*Id.*, PageID 3103–04, 3107.) Ms. Hovanec had met Theodorou in 2019 while living in South Africa with T.H., in connection with his job as an employee of the U.S. State Department. (*Id.*, PageID 3103; R. 163, Sentencing Hr'g Tr., PageID 3533.) Theodorou and Ms. Hovanec became romantically involved there, and their relationship continued after Ms. Hovanec returned to the United States. (R. 135, PSR, PageID 3103–04.)

In late 2021 and early 2022, Ms. Hovanec and T.H. were in the midst of divorce proceedings and a custody dispute for their three children. (*Id.*, PageID 3104.) Ms. Hovanec and the children were staying with her mother, Anita Green, in Wapakoneta, Ohio. (*Id.*, PageID 3102–03.) T.H. lived in the Washington, D.C. area and would periodically drive up to Wapakoneta to visit the children pursuant to a court-ordered custody arrangement. (*Id.*, PageID 3103.) In November 2021, when T.H. returned the children after a weekend visitation, Ms. Hovanec noticed bruising

3

on the torso, elbow, and leg of their oldest daughter. (R. 163, Sentencing Hr'g Tr., PageID 3566.) Ms. Hovanec contacted law enforcement that same day to file a report. (*Id.*) Their investigation revealed that T.H. had reacted angrily to two of the children jumping on a bed and "making a commotion," yelled at them, roughly picked up his oldest daughter, and put her down in a chair, causing the bruises. (*Id.*, PageID 3566–67.)

By this point, Theodorou and Ms. Hovanec had contemplated killing T.H. for some time. (R. 135, PSR, PageID 3108.) Their first idea was to hire a hitman. (R. 163, Sentencing Hr'g Tr., PageID 3549.) Theodorou began asking around in South Africa to find someone willing to travel to the United States and kill T.H. (*Id.*, PageID 3594.) An associate of Theodorou connected him with a first candidate, who had serious conversations with Theodorou and Ms. Hovanec about killing T.H., but backed out after learning that T.H. was a State Department employee. (*Id.*, PageID 3594–95.) Theodorou, through this same associate, then found a second candidate, who wanted 100,000 South African rand (roughly $5,500 USD) to kill T.H., with half paid up front. (*Id.*, PageID 3550.) Theodorou gathered his own money to make the up-front payment and traveled within South Africa to meet with his associate, who gave the money to this second candidate. (*Id.*, PageID 3550–51.) After receiving the money, the second candidate disappeared. (*Id.*)

Theodorou went back to his associate again, still trying to find someone who would kill T.H. (*Id.*, PageID 3551.) That associate became the third candidate. (*Id.*) Theodorou's associate told him about M99, that it is used as a tranquilizer on large animals, and that it is "devastating to humans." (*Id.*) Theodorou's associate acquired a quantity of M99 from a veterinarian and sold it to Theodorou. (*Id.*, PageID 3551, 3600; R. 135, PSR, PageID 3107.) The plan was for Theodorou and his associate to travel to the United States together in April 2022, having shipped the M99 to Ms. Green's house in Wapakoneta beforehand. (R. 163, Sentencing Hr'g Tr., PageID 3551.) Theodorou's associate would collect the M99 there, use it to kill T.H., and then fly back to South Africa. (*Id.*) To further this plan, Theodorou and his associate built a metal container to conceal the M99, placed the vial of M99 inside, and placed the container in a box filled with clothing and other innocuous items. (*Id.*, PageID 3552.) Theodorou paid for and shipped box on February 22, 2022, with a delivery date of March 1. (*Id.*, PageID 3552, 3596–97; R. 135, PSR, PageID 3107.)

About a week before he was set to travel to the United States, Theodorou's associate backed out and did not go. (R. 163, Sentencing Hr'g Tr., PageID 3551.) Theodorou continued with the plan, however, and flew to the United States in April 2022 to meet up with Ms. Hovanec. (*See id.*, PageID 3553.) In the words of the FBI case agent, Theodorou "wanted to be with Amanda, so he was doing whatever he

needed to do to facilitate that end result." (*Id.*, PageID 3600.) In April 2022, Theodorou was staying in the same house with Ms. Hovanec, her mother, and her children. (*Id.*)

On April 22, 2024, the court adjudicating the divorce and custody dispute between T.H. and Ms. Hovanec held a hearing and awarded T.H. an immediate weekend visitation period with the children. (*Id.*, PageID 3553.) Later that day, a visibly upset Ms. Hovanec stated to Ms. Green that she was going to kill T.H. (*Id.*, Page 3553–54.) Ms. Green took Ms. Hovanec for a drive afterward and showed her "an area, a pond that Anita knew was going to be filled in with soil." (*Id.*, PageID 3554.)

Theodorou, Ms. Hovanec, and Ms. Green then discussed what they would do with T.H.'s body, and specifically, the pond Ms. Green had shown Ms. Hovanec as a place to dispose of it. (*Id.*, PageID 3554.) Theodorou took charge of the conversation:

> Theodorou told everyone that wasn't a good idea to put [T.H.] in the pond. Even if they were going to fill it with soil, you would have to weigh the body down. The pond is close to the road. If those weights break free, the body would float to the surface. So, ultimately, they decided that they would bury his body in the north in the woods where, ultimately, his body was buried.

(*Id.*) Ms. Green provided shovels, bibs, and rubber boots to Theodorou and Ms. Hovanec, and drove them to the rural area, where they dug a grave in advance. (*Id.*, PageID 3555.)

On the evening of April 24, 2022, T.H. arrived at the house to drop off the children following the two-day visitation period. (R. 135, PSR, PageID 3104.) Ms. Hovanec and Ms. Green were standing outside, with Theodorou waiting inside. (*Id.*; *see* R. 129-2, Tr. of Theodorou Interview with Law Enforcement, PageID 2635.) Ms. Green ushered the children into the house to give them new toys Ms. Hovanec had bought for them. (R. 135, PSR, PageID 3104; *see* R. 163, Sentencing Hr'g Tr., PageID 3530, 3534.) As T.H. was unloading the car, Ms. Hovanec injected him with the M99 she had received from Theodorou, using a syringe. (R. 135, PSR, PageID 3104.) T.H. died shortly thereafter. (*Id.*, PageID 3104–05.)

Theodorou, in Ms. Hovanec's vehicle, followed behind Ms. Hovanec, in T.H.'s vehicle, as they drove to Dayton, Ohio. (R. 135, PSR, PageID 3105.) They parked T.H.'s vehicle near a park in Dayton, discarded T.H.'s phone and other contents of the vehicle, and returned to Wapakoneta in Ms. Hovanec's vehicle. (*Id.*, PageID 3105–06; R. 163, Sentencing Hr'g Tr., PageID 3527.) Ms. Green was present when Theodorou and Ms. Hovanec loaded T.H.'s body into the back of Ms. Hovanec's vehicle. (R. 163, Sentencing Hr'g Tr., PageID 3555.) Ms. Green dropped them off at the rural area where they unloaded and then buried the body. (*Id.*) Ms. Green then drove back every hour to see if they were finished, and eventually picked them up and drove back to the house. (*Id.*)

### B.     Law enforcement's brief investigation

Within 24 hours of the opening of a federal investigation, Theodorou, Ms.
Hovanec, and Ms. Green were all arrested and in custody. (*Id.*, PageID 3592–94.)
Within 36 hours, T.H.'s body had been recovered. (*Id.*)

After T.H. did not check out of his hotel on April 26, the hotel contacted local
police, who in turn contacted the FBI because T.H. was a State Department em-
ployee. (*Id.*, PageID 3521–22.) Law enforcement obtained location data for T.H.'s
cell phone from his mobile provider. (*Id.*, PageID 3525.) The data revealed that
T.H.'s cell phone had last "pinged" its location in Dayton, Ohio. The coordinates
of that location ping led law enforcement to T.H.'s vehicle, and they quickly discov-
ered a dash camera inside. (*Id.*, PageID 3526–27.) The dash camera's video and au-
dio footage plainly showed T.H.'s death and Ms. Hovanec's involvement. (*Id.*,
PageID 3529–30.)

When law enforcement separately questioned Theodorou and Ms. Hovanec,
they initially denied any knowledge of T.H.'s disappearance, but both immediately
confessed when they were told about the dashcam footage. (*Id.*, PageID 3534–35,
3618; R. 135, PSR, PageID 3106.) Ms. Hovanec clumsily attempted to deflect the
blame off of her codefendants, minimize their involvement, and take sole responsi-
bility for the killing. She claimed someone other than Theodorou sourced the M99

and helped her dispose of T.H.'s body. (R. 163, Sentencing Hr'g Tr., PageID 3619–21.) Once investigators confronted her with information they had obtained from separately interviewing Theodorou, she "said she made him and but [sic] that he didn't want to." (*Id.*) Ms. Hovanec similarly told investigators "I made them do it" and that Theodorou did not even know about the plan to kill T.H. before it happened. (*Id.*, PageID 3642; R. 135, PSR, PageID 3106.) This was, of course, not true. She eventually told investigators where to find T.H.'s body. (R. 163, Sentencing Hr'g Tr., PageID 3621.) Theodorou, meanwhile, made a deal with the government. (*See* R. 96, Theodorou Plea Agreement.[1])

## II.    Procedural history

### A.    Indictment and guilty plea

Ms. Hovanec was charged with (Count I) conspiracy to import a controlled substance, in violation of 21 U.S.C. § 963; (Count II) importation of a controlled substance, in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and (b)(3); (Count IV) conspiracy to possess with intent to distribute and distribution of a controlled substance, in violation of 21 U.S.C. § 846; and (Count V) distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). (R. 11, Indictment, PageID 85–88.) Each of these counts also alleged that the use of the controlled

---

[1] Because this document is sealed and the undersigned counsel does not have access to it, the PageID number is unknown.

substance resulted in the death of T.H., triggering an enhanced penalty under 28 U.S.C. § 841(b)(1)(C). (*Id.*, PageID 86–88.)

On February 14, 2024, Ms. Hovanec pleaded guilty to Counts I, II, IV, and V of the indictment. (R. 93, Change of Plea Hr'g Tr., PageID 1113–14.) She did so without a plea agreement. (*See id.*, PageID 1101.)

### B.    Sentencing

#### 1.    The PSR

A probation officer conducted a presentence investigation, which included an interview with Ms. Hovanec, an interview with her sister, and a review of records and reports from law enforcement, court documents, and other investigative material, and prepared a presentence report ("PSR"). (R. 135, PSR, PageID 3103, 3110.)

The PSR included information regarding Ms. Hovanec's social background and mental health. (*Id.*, PageID 3110–13.) Ms. Hovanec reported that throughout her childhood, her father, Samuel Green, was an alcoholic and extremely physically abusive. (*Id.*, PageID 3110.) He often punched Ms. Hovanec's mother, Anita Green, and, on specific occasions, poured scalding hot water on her and attempted to run her over with a vehicle. (*Id.*) The abuse extended to Ms. Hovanec and her five sisters. (*Id.*) Her father punched his daughters, smacked them, and dragged them around by their hair. (*Id.*) Due to these abusive episodes, Ms. Hovanec and her sisters would stay with their grandmother at times. (*Id.*) Ms. Hovanec recalled several instances of

10

police intervention during her childhood. (*Id.*, PageID 3111.)

Ms. Hovanec's sister, Samantha Green, spoke with the probation officer and corroborated their father's physical abuse inflicted on her mother and sisters, including Ms. Hovanec. (*Id.*) She recalled one instance of police intervention where their father received a verbal warning. (*Id.*)

Ms. Hovanec reported that she had been diagnosed with depression in 2010, depression and anxiety in 2020, and an eating disorder as a teenager. (*Id.*, PageID 3112–13.) Records from the Lucas County Corrections Center indicated that Ms. Hovanec "met the criteria for Post-Traumatic Stress Disorder (PTSD) based upon distressing memories, nightmares, flashbacks, psychological distress due to triggers, psychological reactions to triggers, negative thoughts about oneself, distorted thoughts about the event that cause feelings of blame, ongoing negative emotions (*i.e.* anger), feelings of social isolation, sleep difficulties, being easily startled, and difficulty concentrating." (*Id.*) She also met the criteria for "other specified anxiety disorder." (*Id.*)

The PSR also included calculations of Ms. Hovanec's range under the United States Sentencing Guidelines and recommendations regarding certain sentence enhancements and reductions. It noted that the base offense level for Ms. Hovanec's convictions was 43. (*Id.*, PageID 3109.) This is the highest offense level on the

11

Sentencing Table found at USSG Ch. 5, Pt. A. The PSR recommended a two-point enhancement under § 3B1.1(c) for being an "organizer, leader, manager, or supervisor" of criminal activity—that is, "direct[ing] Theodorou and Green as to the killing of T.H. and the covering up of the crime." (*Id.*) It also recommended a two-point enhancement under § 3C1.1 for obstructing or impeding the administration of justice—that is, "dr[iving] T.H.'s vehicle and abandon[ing] it in Dayton, Ohio, dispos[ing] of T.H.'s property in multiple dumpsters, dispos[ing] of the syringe and bottle that the etorphine used to kill T.H. came in, and bur[ying] T.H.'s body." (*Id.*)

The PSR then recommended a three-point reduction in the offense level for acceptance of responsibility—two points for "clearly demonstrat[ing] acceptance of responsibility for the offense" and an additional point for "assist[ing] authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty." (*Id.*, PageID 3109.)

Ms. Hovanec filed objections to the PSR's recommended applications of the two sentence enhancements. (R. 128-1, Ltr. to Prob. Officer, PageID 2552.) She submitted that her final offense level should be 40—factoring in a three-level reduction for acceptance of responsibility from the initial offense level of 43—resulting in a sentencing guidelines range of 292–365 months. (R. 128, Def.'s Sentencing Mem., PageID 2546.)

### 2.    Psychological evaluation

Dr. Jolie S. Brams, a clinical and forensic psychologist, examined Ms. Hovanec prior to sentencing. (R. 128-2, Psych. Eval., PageID 2553; *see* R. 128-3, Brams CV, PageID 2572.) Dr. Brams also interviewed two of Ms. Hovanec's sisters and reviewed numerous documents regarding this case, Ms. Hovanec's background, and her divorce proceedings. (R. 128-2, Psych. Eval., PageID 2554.) Dr. Brams' task was to "provide an assessment of Ms. Hovanec's history, functioning, and prognosis," and she made clear that she "was retained for her time and expertise, and not to provide any predetermined opinions regarding this legal matter." (*Id.*, PageID 2553–54.) The resulting psychological evaluation and report was submitted as an exhibit to Ms. Hovanec's sentencing memorandum.

Dr. Brams' report discussed Ms. Hovanec's "extensive history of abuse, abandonment, and a host of mental health problems stemming from her childhood and continuing into adulthood," noting that these were "abundantly important" in this specific case. (*Id.*, PageID 2556.) Ms. Hovanec and her five sisters grew up in rural poverty, living with their alcoholic father and their mother, Ms. Green. (*Id.*) Ms. Hovanec and her sisters separately described to Dr. Brams the "horrific abuse" they suffered as children and stated that "all of them are suffering from the impact of this trauma even as adults in their 30s." (*Id.*, PageID 2557.) This included daily

13

exposure to physical violence, including beatings with "belts or other implements" by both their parents. (*Id.*) Jill Barber, the oldest, told Dr. Brams she felt it was her duty to "'guard' the safety of her younger sisters, and this term 'guard' was used throughout the interviews." (*Id.*) The children spent hours hiding in terror from their parents' violence toward them and each other. (*Id.*) In one instance, their father burned their mother's face with hot grease. (*Id.*) Visits to the house from the police were common, but would abate the violence only temporarily. (*Id.*) Ms. Hovanec recalled instances of sexual abuse by her father as well. (*Id.*, PageID 2561.)

Emotional abuse and neglect also pervaded Ms. Hovanec's childhood. Her father was constantly intoxicated and did not do much parenting. (*Id.*, PageID 2556.) Neither did Ms. Green, who showed little interest in Ms. Hovanec's life during her childhood and provided no supervision or boundaries as she grew up. (*Id.*) Jill Barber, the oldest sister, reported that "by age nine she had full responsibility for her younger sisters, left alone all day." (*Id.*, PageID 2558.) Both of Ms. Hovanec's sisters who were interviewed separately described Ms. Green's pervasive narcissism and compulsive lying. (*Id.*, PageID 2566–67.) They each told Dr. Brams that their "mother, Anita Green, is one, perfectly capable of carrying out [the killing of T.H.] as an initiator and not a passive bystander, and two, worked diligently to convince Ms. Hovanec that this was an appropriate course of action." (*Id.*) Ms. Barber stated

14

that she "believes that her mother planned the murder and had no qualms about burying the body," stating: "Amanda and Anthony might have said it (wanting to get rid of Mr. Hovanec) but it was Mom who was the murderer." (*Id.*, PageID 2566–67.) In sum, Ms. Hovenec's "sisters want nothing more than their mother to be incarcerated for life." (*Id.*, PageID 2571.)

Dr. Brams noted that "[t]he role of Anita Green in damaging her children is likely a central part of understanding" Ms. Hovanec. (*Id.*, PageID 2559.) "Ms. Hovanec speaks about her mother in protective tones, although she is also angry and traumatized by what she reports is profound neglect, not only during her early childhood years, but as an adolescent." (*Id.*) Dr. Brams noted that "the way in which Ms. Hovanec describes her mother's involvement in this situation is incomplete, and Ms. Hovanec takes complete responsibility for what occurred." (*Id.*, PageID 2567.) Specifically, "the excuses she gives for her mother are somewhat nonsensical," and Dr. Brams "pushed her as far as possible to confront her mother's involvement in this situation, but she minimizes her mother's responsibility and maximizes her own":

> Ms. Hovanec was directly asked about her mother's role in the offense, and why she did not stop it. Ms. Green could have broken the syringe, warned Mr. Hovanec, called for help, talked her daughter out of this deed, kicked Anthony out of the house and more. The defendant replies that her mother knew little, yet this is not believable. Her mother saw the syringe, and she was there in the moments before and during the

15

murder. The sisters believe that this was planned, with the mother as the leader, well before the murder. What she reports is just not possible. She had no explanation as to why her mother would help to dispose of the body. She has no insight into her mother's capabilities or influence.

(*Id.*, PageID 2567–68.)

Dr. Brams concluded that "Ms. Hovanec's mental health and other developmental expectations were greatly damaged by her upbringing." (*Id.*, PageID 2560.) She observed that "Ms. Hovanec functions on an emotional level far below that of adulthood" and has "significant deficits in reasoning, reality testing, and coping skills." (*Id.*, PageID 2569, 2571.) Dr. Brams found that Ms. Hovanec "clearly and definitively meets the criteria for posttraumatic stress disorder." (*Id.*, PageID 2569) She also found that Ms. Hovanec met the criteria for "Bulimia Nervosa, in partial remission," "Substance Disorder, in full remission due to confinement," "Persistent Depressive Disorder," noted the "possibility of symptoms on the autism spectrum," and observed "characteristics of many personality disorders." (*Id.*, PageID 2570.) However, she found that "[i]t would be diagnostically inappropriate, despite the offense, to label [Ms. Hovanec] as antisocial." (*Id.*)

Ms. Hovanec's sisters also reported that they were "suffering from the impact of this trauma even as adults in their 30s." (*Id.*, PageID 2557.) Both sisters, "who are very different from each other and have had different lives, found their interviews with [Dr. Brams] to be upsetting." (*Id.*, PageID 2559.) "At times they could not stop

crying, and described their damages in detail: not trusting, not knowing how to argue or hold their ground, isolation, depression, and shame." (*Id.*) Ms. Barber noted that she "has had 'ten years of therapy' to face the damages caused by her upbringing." (*Id.*, PageID 2558.)

Dr. Brams stressed in conclusion that Ms. Hovanec's "mental health deficits and difficulties should not be used as an excuse for the offense behavior," but rather "explain her state of mind at the time of the offense and before, and her limited decision-making and coping abilities" (*Id.*, PageID 2571.) Dr. Brams also noted that Ms. Hovanec "does not seem to be a high risk for future offending." (*Id.*)

### 3.    The sentencing hearing

The district court held a sentencing hearing on October 1, 2024. (R. 163, Sentencing Hr'g Tr., PageID 3497.) At the outset, the court commented: "I've never struggled more mightily with a case than I have with the sentencing determination in this case." (*Id.*, PageID 3503; *see also id.*, PageID 3704 ("I'll just say this is the toughest case I've ever had to work on").) The FBI case agent testified, as did a detective with the Auglaize County Sheriff's Office. (*Id.*, PageID 3520, 3604.) The defense called no witnesses, but Ms. Hovanec gave a brief allocution. (*Id.*, PageID 3696–97.) The court also heard victim impact statements from T.H.'s mother, his brother, and a government official who worked with T.H. at the State Department.

(*Id.*, PageID 3665–83.)

The district court heard argument regarding the two sentence enhancements recommended by the PSR. (*Id.*, PageID 3530.) The court found that the aggravating role enhancement applied because Ms. Hovanec "exercised some emotional control over Theodorou" and that "she was manipulating him." (*Id.*, PageID 3653.) The court did not make a finding in that regard as to Ms. Green. The court found that the obstruction enhancement applied as well, stating: "I really never had any doubt about that one since I've first come onto this case in terms of everything that happened here." (*Id.*, PageID 3654.) The district court also found, over the government's objection, that Ms. Hovanec was entitled to a two-point reduction of her offense level for acceptance of responsibility. (*Id.*, PageID 3661.) The government's opposition made a three-point reduction unavailable.

In considering the § 3553(a) factors, the district court dismissed Dr. Brams' report, taking it "with the not grain of salt, but shaker of salt that [the government] poured on it" and characterized Dr. Brams as a "hired advocate." (*Id.*, PageID 3705–06.) The court commented: "It's also hard for me not to fathom that there were at least a few missing pieces in Ms. Hovanec's life coming up to get her to where she was, but I tend to agree more than I disagree with [the government's] observations about that." (*Id.*, PageID 3706.)

Starting with an offense level of 43, adding two points for the aggravating role enhancement, adding two more for the obstruction enhancement, and subtracting two points for acceptance of responsibility resulted in an offense level of 45, which automatically reverted to 43, the maximum. (*Id.*, PageID 3662–63.) The guidelines range for an offense level of 43—regardless of the criminal history category—is no range at all. The only sentence provided for is life without the possibility of parole. USSG Ch. 5, Pt. A. Had the district court found that neither enhancement applied, Ms. Hovanec's final offense level would have been 41, resulting in a guidelines range of 324–405 months. *See id.*

Instead, anchored by the only sentence within the guidelines range as calculated, the district court departed slightly downward and sentenced Ms. Hovanec to 480 months of imprisonment as to each of Counts I, II, IV, and V, to run concurrently. (R. 137, Judgment, PageID 3156–57.) The court also ordered restitution in the amount $2,108,559.36 and a special assessment of $400. (*Id.*, PageID 3161.) Ms. Hovanec timely appealed. (R. 147, Notice of Appeal, PageID 3221.)

## C.    Proceedings against Ms. Hovanec's codefendants

### 1.    Anthony Theodorou

Theodorou was charged in Counts I, II, IV, and V along with Ms. Hovanec, as well as Count III, which charged only him with an additional count of distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), with the

same enhanced penalty as the other counts. (R. 11, Indictment, PageID 87.) In a separate hearing, Theodorou pleaded guilty to Counts I, II, IV, and V, with the benefit of a plea agreement with the government. (*See* R. 96, Theodorou Plea Agreement.) Count III was later dismissed on the government's motion. (R. 140, Theodorou Judgment, PageID 3192.)

The district court sentenced Theodorou to 216 months of imprisonment as to Counts I, II, IV, and V, to run concurrently—less than half of the time Ms. Hovanec received. (*Id.*, PageID 3193.) The court also ordered restitution in the amount $2,108,559.36 and a special assessment of $400. (*Id.*, PageID 3197.)

### 2.    Anita Green

Count VI of the indictment charged Ms. Green with being an accessory after the fact, in violation of 18 U.S.C. § 3. (R. 11, Indictment, PageID 89.) She pleaded guilty to Count VI in a separate hearing. (R. 66, Green Change of Plea Hr'g Tr., PageID 629.) Theodorou testified at Ms. Green's sentencing hearing pursuant to his plea agreement with the government. (R. 160, Green Sentencing Hr'g Tr., PageID 3280, 3285.) The district court sentenced Ms. Green to 121 months of imprisonment and ordered restitution in the amount $126,000 and a special assessment of $100. (R. 162, Am. Judgment, PageID 3491–92, 3496.) Ms. Green has appealed. (R. 144, Green Notice of Appeal, PageID 3214; R. 164, Green Notice of Appeal, PageID

3716.)

## Standard of Review

This Court reviews sentences "for reasonableness, which . . . has both substantive and procedural components." *United States v. Thomas*, 498 F.3d 336, 339 (6th Cir. 2007) (cleaned up). A sentence is procedurally unreasonable if, among other things, the district court "fail[s] to calculate (or improperly calculate[s]) the Guidelines range, treat[s] the Guidelines as mandatory, fail[s] to consider the [18 U.S.C.] § 3553(a) factors, select[s] a sentence based on clearly erroneous facts, or fail[s] to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007). Substantive reasonableness refers to the fairness and appropriateness of a sentence considering the totality of the circumstances of each case. *See id.*

In evaluating the district court's calculation of the advisory Guidelines range, this Court reviews the district court's factual findings for clear error and its legal conclusion de novo. *United States v. Sands*, 948 F.3d 709, 712 (6th Cir. 2020). The Court reviews de novo the district court's "legal interpretation of the Guidelines, including mixed questions of law and fact." *Id.* at 712–13 (citation omitted). "A district court's application of the facts to the Sentencing Guidelines is one such mixed question that requires fresh review." *Id.* at 713 (cleaned up); *see, e.g.*, *United States*

*v. Iossifov*, 45 F.4th 899, 922 (6th Cir. 2022) ("Whether conduct constitutes obstruction of justice under Guidelines § 3C1.1 is reviewed de novo, given that it is a mixed question of law and fact." (cleaned up)); *United States v. Olive*, 804 F.3d 747, 759 (6th Cir. 2015) ("We review the factual findings of the district court on this issue for clear error and accord deference to the legal conclusion that a person is an organizer or leader under Section 3B1.1."). The Court "consider[s] the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall*, 552 U.S. at 51.

## Summary of the Argument

The district court committed clear error by mischaracterizing the most important mitigating evidence in the record, and it did so in two ways. First, the court adopted the government's mischaracterization of Dr. Brams' report as containing only "unsubstantiated" statements when the most important aspects of the report—describing the abuse Ms. Hovanec suffered as a child and her mental health issues—were corroborated by multiple other individuals. Second, the court inaccurately stated that Dr. Brams was a "hired advocate" and improperly dismissed her report as a work of advocacy rather than objectivity. These errors resulted in both procedural and substantive unreasonableness as to Ms. Hovanec's sentence.

The district court also erred in applying two sentence enhancements that increased Ms. Hovanec's offense level and guidelines calculation. The court misapplied the aggravated role enhancement to Ms. Hovanec by relying on her emotional relationship with her romantic partner, Theodorou, rather than proof that she exercised actual managerial control over him. The evidence shows Theodorou acted independently and made significant contributions to the criminal plan while in South Africa, far from Ms. Hovanec's influence. His actions—including hiring hitmen, acquiring and shipping the drug M99, and helping dispose of the body—demonstrate autonomy rather than subordination. Additionally, the mitigating evidence in Dr. Brams' report that the district court failed to properly evaluate revealed Ms. Hovanec's significant cognitive and emotional impairments, undermining the notion that she could have controlled others. The court's reliance on her inconsistent and self-incriminating statements taken out of context was also misplaced, as they were accompanied by several others that were immediately proven false in a feeble attempt to shield her codefendants.

As for the obstruction enhancement, none of Ms. Hovanec's actions slowed down law enforcement. They found T.H.'s car by using his cell phone location data, found the dashcam footage in the car, and used it to obtain confessions within 24 hours of the FBI becoming involved and the location of T.H.'s body soon after. In

evaluating this enhancement, the district court erred by admitting it had made up its mind well before the hearing, and by relying on legal authority that does not apply in this context.

For these reasons, the Court should vacate and remand for resentencing.

**ARGUMENT**

**I.    The district court erred by misreading the psychological evaluation report and mischaracterizing its important mitigating evidence.**

**A.    The mitigating evidence detailed in Dr. Brams' report was significant and compelling.**

Before issuing a sentence, a district court must consider "the history and characteristics of the defendant." 18 U.S.C. 3553(a)(1). Evidence regarding social background and mental health is "relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Boyde v. California*, 494 U.S. 370, 382, (1990) (cleaned up). Such evidence has become more important in recent years as the study of childhood trauma and its effects on mental health has progressed.

The most significant evidence in the record relevant to this factor is found in Dr. Brams' report, attached as an exhibit to Ms. Hovanec's sentencing memorandum. (R. 128-2, Psych. Eval., PageID 2553–71.) The Supreme Court has repeatedly noted that evidence of profound physical abuse and neglect and resulting mental

24

health disorders, like that described in Dr. Brams' report, is important for a sentencing court to consider. *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 33–36 (2009); *Rompilla v. Beard*, 545 U.S. 374, 391–92 (2005); *Wiggins v. Smith*, 539 U.S. 510, 516–17 (2003); *Williams v. Taylor*, 529 U.S. 362, 395 (2000); *see also Hamblin v. Mitchell*, 354 F.3d 482, 487 n.2 (6th Cir. 2003).

Like the petitioners in those cases, Ms. Hovanec's childhood was nothing short of "nightmarish." *Williams*, 529 U.S. at 395. Dr. Brams' report detailed Ms. Hovanec's extensive history of abuse, abandonment, and mental health problems from childhood into adulthood. Ms. Hovanec and her sisters described severe physical and emotional abuse by their parents, including constant beatings and neglect, and witnessing the horrific domestic violence their alcoholic father inflicted on their mother, including burning her face with hot grease. The six girls hid in terror from their parents while the older sisters tried their best to protect the younger ones. The parents also neglected the children, and Ms. Hovanec was essentially raised by her older sisters, starting when the oldest was only nine.

Dr. Brams found that Ms. Hovanec's upbringing significantly damaged her mental health and developmental expectations, leading to deficits in reasoning, reality testing, and coping skills. Dr. Brams discussed several mental health disorders but specifically emphasized that Ms. Hovanec "clearly and definitively meets the

criteria for posttraumatic stress disorder":

> In brief, she was exposed to truly life-threatening events in her upbring-
> ing and has many of the related symptoms defined this disorder. These
> include, but are not limited to, recurrent and distressing memories of
> the traumatic event, having dissociative reactions, such as memory loss
> or flashbacks, experiencing distress and exposure to thoughts or exter-
> nal stimuli that resemble the traumatic events, avoidance or efforts to
> avoid distressing memories, persistent negative beliefs about them-
> selves or others, distorted cognitions about the etiology of the traumatic
> events, persistent negative emotional states, feelings of detachment or
> estrangement, and the persistent inability to experience positive emo-
> tions. She also exhibits reckless and self-destructive behaviors, and hy-
> pervigilance about the world around her. The information provided by
> the defendant and her sisters are in line with each other and clearly de-
> scribe life-threatening and other significant traumatic experiences in
> their developmental years. As noted earlier in this report, this damage
> occurred early on, and Ms. Hovanec (as well as her sisters) struggled in
> adult life. She clearly meets the criteria for posttraumatic stress disor-
> der.

(R. 128-2, Psych. Eval., PageID 2569.) This evidence constitutes the "kind of trou-

bled history [the Supreme Court has] declared relevant to assessing a defendant's

moral culpability." *Wiggins*, 539 U.S. at 535.

The combination of a history of childhood abuse and resulting, lasting PTSD

is particularly important evidence in favor of mitigation. Consider *McKinney v. Ryan*,

813 F.3d 798 (9th Cir. 2015) (en banc). The petitioner "presented evidence of se-

vere, prolonged childhood abuse that, in the words of the sentencing judge, was 'be-

yond the comprehension and understanding of most people,'" and his diagnosis of

26

"PTSD as a result of his horrific childhood." *Id.* at 823. The en banc court high-lighted that the petitioner's "PTSD was important mitigating evidence, central to his plea for leniency," and granted conditional habeas relief because the Arizona Su-preme Court gave it no weight as a matter of law (by improperly imposing a causative nexus requirement). *Id.*; *Reddy v. Kelly*, 657 F. App'x 531, 547 (6th Cir. 2016) (finding prejudice under *Strickland* where counsel failed to present evidence of the defend-ant's PTSD diagnosis). Such mitigating evidence is critical for a sentencing court to consider.

## B.    The district court clearly erred by mischaracterizing the nature of the mitigating evidence in Dr. Brams' report.

Ms. Hovanec's sentence is procedurally unreasonable because the district court selected it "based on clearly erroneous facts." *Gall*, 552 U.S. at 51. "A factual finding is clearly erroneous where, although there is evidence to support it, the re-viewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Gillespie*, 713 F. App'x 471, 474 (6th Cir. 2017) (cleaned up).

In arguing for a life sentence without parole, the government "question[ed] [the] validity" of Dr. Brams' report and asserted that "*nothing* in there was substantiated." (R. 163, Sentencing Hr'g Tr., PageID 3699–3700 (emphasis added).) To the contrary, in addition to Ms. Hovanec, Dr. Brams interviewed two of her

sisters, and they both corroborated the significant history of physical, mental, and emotional abuse she suffered as a child. They also described their own mental health issues caused by lasting trauma, substantiating Ms. Hovanec's mental health disorders discussed in the report, in particular, her PTSD.

In its discussion of the § 3553(a) factors, the district court's only comments regarding Ms. Hovanec's history and characteristics were to dismiss Dr. Brams' detailed psychological evaluation report, accept the government's arguments—including its inaccurate characterization of Dr. Brams' report as unsubstantiated—and characterize Dr. Brams as a "hired advocate." (R. 163, Sentencing Hr'g Tr., PageID 3705–06.) The court stated that it was taking the report "with the not grain of salt, but shaker of salt that [the government] poured on it." (*Id.*, PageID 3705.) The court commented: "It's also hard for me not to fathom that there were at least a few missing pieces in Ms. Hovanec's life coming up to get her to where she was, but I tend to agree more than I disagree with [the government's] observations about that." (*Id.*, PageID 3706.)

The district court thus adopted the government's mischaracterization of Dr. Brams' report. (R. 163, Sentencing Hr'g Tr., PageID 3705–06.) Doing so was clearly erroneous. Standing alone, a defendant's testimony regarding her own social background and mental health "could easily [be] dismissed" as "not credible" and

"self-serving." *Miller v. Dretke*, 420 F.3d 356, 366 (5th Cir. 2005). When corroborated by other witnesses and mental health professionals, however, such evidence may take on "a new light" and become significantly more compelling. *See id.* If a "sentencing court mischaracterize[s] the nature and sources of the mitigating evidence" in this way, it can have a substantial impact on the weight the evidence is given at sentencing. *See McMullen v. Dalton*, 83 F.4th 634, 646 (7th Cir. 2023) (in reversing denial of habeas petition, finding "[t]he state appellate court failed to evaluate the totality of the available mitigation evidence").

Dr. Brams interviewed Ms. Hovanec's sisters separately, and each corroborated numerous specific statements she made regarding her childhood. Dr. Brams noted that "[t]he information provided by the defendant and her sisters are in line with each other and clearly describe life-threatening and other significant traumatic experiences in their developmental years." (R. 128-2, Psych. Eval., PageID 2569.) Dr. Brams also observed that both sisters "found their interviews with [her] to be upsetting" and "[a]t times they could not stop crying, and described their damages in detail: not trusting, not knowing how to argue or hold their ground, isolation, depression, and shame. They recognize that Ms. Hovanec has the same or worse issues." (*Id.*) Ms. Barber noted that she "has had 'ten years of therapy' to face the damages caused by her upbringing." (*Id.*, PageID 2558.)

29

This Court has previously emphasized the importance of attributing testimony to the correct source in making a sentencing determination. *United States v. Knight*, 756 F. App'x 571 (6th Cir. 2018). In *Knight*, the district court applied the obstruction of justice enhancement after finding that one of the two defendants "had solicited false testimony from his girlfriend, to the effect that he had been in Kentucky when a fraudulent fax was sent from his Ohio office." *Id.* at 575. However, it was actually his codefendant, "not the girlfriend, [who] gave that testimony." *Id.* The Court found that the "stated basis for the enhancement was therefore clearly erroneous," and vacated that defendant's sentence. *Id.*

The similarities here compel the same result. The statement of Ms. Hovanec's two sisters to Dr Brams corroborated not only Ms. Hovanec's significant history of childhood trauma, but also the mental health disorders stemming from it. Their similar experiences have led to similar present issues with their mental health and attempts to seek professional treatment, further corroborating Dr. Brams' conclusion that Ms. Hovanec "clearly and definitively meets the criteria" for PTSD. (*Id.*, PageID 2569.) Because the district court failed to recognize that this important evidence was in fact substantiated by multiple other individuals, it made a clear error of fact.

The district court clearly erred further by dismissing Dr. Brams' report as the

product of a "hired advocate." Dr. Brams' report itself makes clear that this was not the case. She "was retained for her time and expertise, and not to provide any pre-determined opinions regarding this legal matter." (R. 129-2, Psych. Eval., PageID 2553–54.) She provided an objective "assessment of Ms. Hovanec's history, functioning, and prognosis." (*Id.*, PageID 2553.) That is the role psychologists play in the sentencing process. As then-Justice Rehnquist once emphasized, "[a] psychiatrist is not an attorney, whose job it is to advocate." *Ake v. Oklahoma*, 470 U.S. 68, 92 (1985) (Rehnquist, J., dissenting). In an earlier case, then-Judge Burger similarly noted "that psychiatrists are physicians, not advocates" and emphasized "their independent stance as professional people" despite "a partisan tendency to regard such an expert as an adversary." *Proctor v. Harris*, 413 F.2d 383, 387 (D.C. Cir. 1969) (Burger, J.).

Other courts have stressed that it is improper to consider psychiatrists and psychologists who assess an individual's mental health as having an advocacy role. *See, e.g.*, *Gay v. Parsons*, 61 F.4th 1088, 1093 (9th Cir. 2023) (noting that psychologists conducting objective assessments of inmates' risk of violent behavior for the state parole board "were neither acting as advocates nor as judges"); *Farris v. Barnhart*, 147 F. App'x 638, 640 (9th Cir. 2005) (finding that an "ALJ's statement that [a treating psychologist's] opinion should be discounted because it was 'submitted

as an advocate' is not legitimate"); *Sorensen v. Barnhart*, 69 F. App'x 864, 865 (9th Cir. 2003) (rejecting ALJ's finding "based on no specific evidence—that the members of the treatment team were 'biased advocates' for Sorensen and therefore that their opinions were not credible").

Assertions concerning mitigation from the mouth of an advocate that are sourced from only the defendant's own statements are fundamentally different from those submitted by an objective mental health professional and corroborated by multiple other witnesses. The district court's mischaracterization of Dr. Brams' report as the former when it was the latter rises to the level of clear error. As such, the 40-year sentence imposed by the district court is procedurally unreasonable. Remand is required to allow the district court to fully and accurately evaluate this critical mitigation evidence.

## C. The district court imposed a substantively unreasonable sentence for these same reasons.

Relatedly, Ms. Hovanec's sentence is substantively unreasonable in light of the totality of the circumstances, and Ms. Hovanec incorporates the above arguments here. *See United States v. Glass*, 749 F. App'x 434, 440 (6th Cir. 2018) (observing that the "boundary" between substantive and procedural reasonableness can be "porous"). The district court's mischaracterizations of the mitigating evidence

in Dr. Brams' report caused it to give too little weight to "the history and characteristics of the defendant." 18 U.S.C. 3553(a)(1). The district court thus abused its discretion in issuing a sentence of 480 months.

## II.    The district court erred in applying the aggravating role enhancement.

Section 3B1.1 of the Sentencing Guidelines provides for an offense level increase of two "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving fewer than five participants. USSG § 3B1.1(c). "Generally, a defendant must have exerted control over at least one individual within a criminal organization for the enhancement of § 3B1.1 to be warranted." *United States v. Minter*, 80 F.4th 753, 758 (6th Cir. 2023) (cleaned up). "Merely playing an essential role in the offense is not equivalent to exercising managerial control over other participants." *Id.* (citation omitted). For example, this Court has reversed a district court's use of this enhancement when it misunderstood the law by relying on the defendant's management of the criminal activity alone. *United States v. Kamper*, 748 F.3d 728, 748 (6th Cir. 2014). The government has a burden to prove by a preponderance of the evidence that this enhancement applies. *Minter*, 80 F.4th at 758.

The district court applied this enhancement after finding that Ms. Hovanec had "exercised some emotional control over Theodorou" and that "she was

manipulating him." (*Id.*, PageID 3653.) (The court did not make a finding regarding this enhancement as to Ms. Green.) The court characterized text messages between Ms. Hovanec and Theodorou as Ms. Hovanec "controlling Mr. Theodorou through their relationship and directing him to do things, if nothing else, pulling his heartstrings, which I submit is a method of controlling someone." (*Id.*, PageID 3640.) The court commented: "it sure feels like it was all her idea" and stated "Didn't the words come out of her mouth 'I made them do it'?" (*Id.*, PageID3641–42.)

The district court erroneously relied on Ms. Hovanec's clumsy attempt to deflect blame off of Theodorou—her romantic partner—and her mother. In the initial interview where she confessed to killing T.H., Ms. Hovanec attempted to protect her codefendants by making up a person she claimed to have bought the M99 from who was not Theodorou. When investigators told her they knew Theodorou was involved, she still attempted to deflect, and did so in ways that were proven false almost immediately. Right after telling investigators that she "made" Theodorou bury T.H.'s body with her, she stated that he "didn't know anything" about the plan to kill T.H. until "after I did it." (*Id.*, PageID 2846.) All of these statements proved to be inaccurate. Ms. Hovanec's statement in context thus takes on a very different character than the many times it was isolated and repeated during the sentencing

34

process.

Instead, a fuller picture of the evidence showed concerted action among and between Ms. Hovanec and Theodorou rather than her controlling him. Theodorou independently engaged in significant amounts of criminal activity furthering the plan to kill T.H. while in South Africa, an ocean away from Ms. Hovanec. There, he:

- Asked around about possible hitmen,

- Talked to all three hitmen candidates,

- Paid the second candidate with his own money,

- Arranged to receive the M99,

- Paid for the M99 with his own money,

- Built a container with his associate to conceal the M99,

- Shipped the package containing the M99 to Ms. Green's house,

- Paid for the shipping of the M99, and

- Planned to accompany the third hitman candidate on the flight to the United States to kill T.H.

(R. 163, Sentencing Hr'g Tr., PageID 3595–99). Then he flew to the United States to join Ms. Hovanec and further participate in the plan to T.H. Ms. Hovanec had no ability to "control" Theodorou while he was on the other side of the world, or make him come to the United States to be an active participant in the offense conduct. Instead, in the words of the FBI case agent, Theodorou "wanted to be with Amanda, so he was doing whatever he needed to do to facilitate that end result." (*Id.*, PageID

3600.) There is no legal basis to conclude that mere romantic feelings qualify as "control" for purposes of this enhancement.

Once in the United States, Theodorou did not become a shrinking violet. After Ms. Green showed Ms. Hovanec a potential pond for the purpose of burying T.H.'s body,

> Theodorou told everyone that wasn't a good idea to put [T.H.] in the pond. Even if they were going to fill it with soil, you would have to weigh the body down. The pond is close to the road. If those weights break free, the body would float to the surface. So, ultimately, they decided that they would bury his body in the north in the woods where, ultimately, his body was buried.

(*Id.*, PageID 3554.) After T.H. was deceased, Theodorou used his superior physical strength to help load T.H.'s body in and out of a vehicle, drag it to the grave site, and bury it.

Once confronted by law enforcement, however, Theodorou attempted to downplay his involvement as much as possible, ultimately securing a favorable plea agreement with the government. As the FBI case agent admitted, "if there are multiple suspects, . . . it's not unusual for one of those suspects to start pointing the finger at somebody else." (*Id.*, PageID 3598.) Indeed, after Theodorou testified at Ms. Green's sentencing hearing, the district court found that he was "dishonest . . . when he said he didn't know what was going to happen as of Friday into Sunday" before T.H.'s death, showing that the district court did not believe him or Ms.

Hovanec's statement to that effect from her initial confession. (R. 160, Green Sentencing Hr'g Tr., PageID 3446.)

At sentencing, the government stated that Theodorou said "this was all her idea, I did what she told me to do, I got these hitmen because she told me to, I helped bury the body because she told me to." (R. 163, Sentencing Hr'g Tr., PageID 3632.) Defense counsel called out this inaccuracy: "Nobody testified that Mr. Theodorou said she made me do it. Nobody said that, okay. Nobody said Mr. Theodorou felt compelled for reasons that we don't know to do it even if he didn't want to." (*Id.*, PageID 3641.) The district court replied, "it sure feels like it was all her idea," which, as discussed above, is not enough. (*Id.*) The court also remained stuck on her obviously false statement in the interview in which she first confessed that "I made them do it," when she was trying to deflect blame from her codefendants and saying other inaccurate things like a nebulous stranger sourced the M99 and Theodorou didn't know anything about the plan to kill T.H. until after he died. (*Id.*, PageID 3642.)

Here as well, the district court's failure to properly evaluate or consider the mitigation evidence in Dr. Brams' report infected its analysis. Dr. Brams found that "Ms. Hovanec functions on an emotional level far below that of adulthood" and has "significant deficits in reasoning, reality testing, and coping skills." (R. 128-2, Psych.

Eval., PageID 2569, 2571.) The report's findings "explain [Ms. Hovanec's] state of mind at the time of the offense and before, and her limited decision-making and coping abilities" (*Id.*, PageID 2571.) Thus, the district court failed to fairly consider this evidence of Ms. Hovanec's capacity to "control" her codefendants, as well has her "nonsensical" tendency to minimize their involvement and "take[ ] complete responsibility for what occurred." (*Id.*, PageID 2567.) Had the district court not failed to recognize that the evidence from Dr. Brams' report was in fact substantiated and authored by an objective mental health professional rather than an advocate, it would have had a much more accurate picture of Ms. Hovanec's limited ability to "control" anyone—much less a South African national who was in the Southern Hemisphere for much of the offense conduct, and, when present in Ohio, physically and mentally stronger than her. *See Knight*, 756 F. App'x at 575.

For these reasons, the district court erred in applying the aggravating role enhancement.

## III.    The district court erred in applying the obstruction enhancement.

Section 3C1.1 of the Sentencing Guidelines provides for an offense level increase of two when the government proves by a preponderance of the evidence that (1) "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or

sentencing of the instant offense of conviction," and (2) the obstructive conduct related to either "the defendant's offense of conviction and any relevant conduct" or a closely related offense. USSG § 3C1.1; *see Knight*, 756 F. App'x at 575 (6th Cir. 2018).

Law enforcement's investigation of T.H.'s death was not slowed down by the actions of Ms. Hovanec. They obtained location data for T.H.'s cell phone from his mobile provider, found his car at the last location ping shown on that data, and discovered the dashcam in the vehicle and its footage showing T.H.'s death, as well as Ms. Hovanec's involvement. Confronted with law enforcement's knowledge of the dashcam footage, Ms. Hovanec and Theodorou each crumbled and immediately confessed. All three defendants were in custody within 24 hours of the FBI opening its investigation. 12 hours later, they had recovered T.H.'s body. As a practical matter, justice was not obstructed here.

Nevertheless, in applying the obstruction enhancement, the district court admitted: "I really never had any doubt about that one since I've first come onto this case in terms of everything that happened here." (*Id.*, PageID 3654.) This shows that the district court predetermined the enhancement's application before hearing the arguments of counsel, which is improper. Federal Rule of Criminal Procedure 32

provides that the district court must "provide the defendant's attorney an opportunity to speak on the defendant's behalf" and "permit the defendant to speak or present any information to mitigate the sentence" before imposing sentence. Fed. R. Crim. P. 32(i)(4)(A)(i)–(ii). By predetermining the enhancement's application, the district court failed to allow Ms. Hovanec and her counsel to advocate on her behalf.

The district court also found "that the government has established, for several of the reasons under *Minter*, the enhancement for obstruction." (R. 163, Sentencing Hr'g Tr., PageID 3655.) But the *Minter* case discussed by counsel for both parties did not involve the obstruction enhancement. The Court in *Minter* examined the aggravating role enhancement of § 3B1.1 and the firearm-possession enhancement of § 2D1.1. 80 F.4th at 757–62. By relying on a completely inapposite case, the district court committed a legal error in applying the aggravated role enhancement.

## Conclusion

As this Court has recognized, "[f]ashioning an appropriate sentence is a most difficult task." *United States v. Robinson*, 669 F.3d 767, 779 (6th Cir. 2012). Particularly so in a case like this. No one disputes the egregious nature of the offense conduct at issue here. Ms. Hovanec admitted and pleaded guilty to crimes for which she will serve decades in prison, regardless of the outcome of this appeal. But this case

highlights the importance of a district court fairly evaluating evidence submitted in mitigation and properly calculating the sentencing guidelines range, as the long potential sentences and high stakes serve to magnify any error. Respectfully, the district court—clearly struggling with the gravity of the offense conduct and the sentencing decision—erred in both tasks. As a result, it issued an unreasonable sentence.

For the reasons discussed above, the Court should vacate Ms. Hovanec's sentence and remand to the district court for resentencing.

Filed: May 14, 2025.

Respectfully submitted,

AMANDA HOVANEC,
*By Counsel*

By    /s/ *Benjamin S. Morrell*
Benjamin S. Morrell
Taft Stettinius & Hollister LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Tel.: (312) 527-4000
Fax: (312) 527-4011
bmorrell@taftlaw.com

*Appointed Counsel for Defendant-Appellant*

## Certificate of Compliance

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that the foregoing document complies with the type-volume limitation of Rule 32(a)(7)(B)(i). It contains 9,212 words, not counting the items listed in Circuit Rule 32(b).

I further certify that the foregoing document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6). It has been prepared using Microsoft Word 2016 in the proportionally spaced typeface of Equity, in 14-point font size.

Date: May 14, 2025.

By    /s/ *Benjamin S. Morrell*

42

## CERTIFICATE OF SERVICE

I certify that on the date listed below, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: May 14, 2025.

By    */s/ Benjamin S. Morrell* _____

## Designation of Relevant District Court Documents

R. 11, Indictment ..................................................................... PageID 85

R. 66, Green Change of Plea Proceedings Transcript ........................... PageID 586

R. 93, Change of Plea Proceedings Transcript ..................................... PageID 1083

R. 96, Theodorou Plea Agreement ........................................... Unknown

R. 128, Defendant's Sentencing Memorandum ................................... PageID 2542

R. 128-1, Letter to Probation Officer .................................... PageID 2552

R. 128-2, Psychological Evaluation ...................................... PageID 2553

R. 128-3, Brams CV, PageID 2572 ........................................ PageID 2572

R. 129-2, Transcript of Theodorou Interview with Law
 Enforcement ............................................................... PageID 2618

R. 129-5, Transcript of Hovanec Interview with Law
 Enforcement ............................................................... PageID 2735

R. 135, Presentence Report ............................................... PageID 3100

R. 137, Judgment ......................................................... PageID 3156

R. 138, Green Judgment ................................................... PageID 3163

R. 140, Theodorou Judgment ............................................... PageID 3192

R. 144, Green Notice of Appeal .......................................... PageID 3214

R. 147, Notice of Appeal ................................................. PageID 3221

R. 160, Green Sentencing Hearing Transcript .............................. PageID 3258

R. 162, Green Amended Judgment ........................................... PageID 3491

R. 163, Sentencing Hearing Transcript .................................... PageID 3497

R. 164, Green Notice of Appeal ........................................... PageID 3716